1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10   J & J SPORTS PRODUCTIONS, INC.

11            Plaintiff,                    No. 2:09-cv-3389 GEB KJN

12        vs.

13   JUAN JOSE HERNANDEZ, et al.,

14            Defendants.              FINDINGS AND RECOMMENDATIONS

15   _____/

16            Presently before this court is plaintiff J & J Sports Productions, Inc.'s application

17   for default judgment.[1]  This matter came on regularly for hearing on May 13, 2010, before the

18   undersigned.  Defendant has not appeared in this action, did not file an opposition to the

19   application for default judgment and did not appear at the hearing.  The undersigned has fully

20   considered the briefs and record in this case and, for the reasons stated below, will recommend

21   that plaintiff's application for default judgment be granted.

22   ////

23   ////

24   _____

25        [1]   This action proceeds before the undersigned pursuant to Eastern District of California
     Local Rule 302(c)(19) and 28 U.S.C. § 636(b)(1).  This matter was referred to the undersigned by
26   an order entered March 26, 2010.  (Dkt. No. 11.)

                                              1

I. <u>Background</u>[2]

Plaintiff, a California corporation, is a closed-circuit distributor of sports and entertainment programming.  Plaintiff, by contract, purchased the commercial exhibition licensing rights to the *"The Dream Match":  Oscar De La Hoya v. Manny Pacquiao, Welterweight Championship Fight Program* of December 6, 2008, including the main event, along with undercard (preliminary) bouts, televised replay and color commentary (hereinafter referred to as the "Program.")  Thereafter, plaintiff entered into sublicensing agreements with various commercial entities throughout the United States and its territories, by which it granted limited public exhibition rights to these entities for the benefit and entertainment of the patrons within its respective establishments (i.e., hotels, racetracks, casinos, taverns, bars, restaurants, social clubs, etc.).

The transmission of the Program was encrypted and made available only to plaintiff's customers, commercial locations which paid plaintiff the requisite closed-circuit license fees in order to have authorization to view the broadcast of the Program.  For example, for the exhibition of this Program, if a commercial establishment had a fire code occupancy of fifty persons, the commercial sublicense fee would have been $2,200.00.

On December 4, 2009, plaintiff filed this action alleging that defendant unlawfully intercepted and intentionally broadcast the Program at defendant's establishment for the purpose of direct or indirect commercial advantage and/or private financial gain.  Plaintiff alleges four claims for relief, which are labeled as "Counts" in the complaint.  Plaintiff's first claim for relief alleges that defendant engaged in the unauthorized publication or use of communications in violation of the Federal Communications Act of 1934 (the "Communications Act"), 47 U.S.C. §§

_____

[2]  This information is derived from plaintiff's motion for default judgment, supporting papers, and complaint on file herein.

1   605, et seq.[3]  (Dkt No. 1 at 3.)  Its second claim alleges that defendant engaged in the

2   unauthorized interception, exhibition, publication and divulgence of the Program at the

3   defendant's establishment, 47 U.S.C. §§ 553, et seq.[4]  (Dkt. No. 1 at 5.)  Plaintiff's third claim

4   alleges a common law claim of conversion.  (Dkt. No. 1 at 6.)  Its fourth claim for relief alleges

5   violation of California Business and Professions Code §§ 17200, et seq.  (Dkt. No. 1 at 7.)

6          Defendant Juan Jose Hernandez, sued individually and d/b/a Mazatlan Tacos Y

7   Mariscos a/k/a Mariscos Mazatlan, operates a food and drink establishment located at 4800

8   Franklin Boulevard, Sacramento, California.  Plaintiff avers that on December 6, 2008,

9   defendant's establishment unlawfully displayed the Program, with approximately 35 patrons in

10  the establishment at the time the Program was being displayed.  Defendant did not obtain a

11  license to exhibit the Program from plaintiff.  Defendant's establishment did not require a cover

12  charge to enter at the time it displayed the Program.

13          A proof of service filed with the court demonstrates that on January 8, 2010,

14  plaintiff, through a process server, attempted personal service on defendant at the address of

15  Mazatlan Tacos Y Mariscos, 4800 Franklin Blvd., Sacramento, California 95820.  (Dkt. No. 6.)

16  The declaration of service states that process was left with Antonio Glez, described as the

17  "person in charge," with instructions to deliver the documents to defendant, and that a copy of

18  the summons, complaint and related documents were mailed to defendant on January 11, 2010.[5]

19  (Id.)

20          On March 11, 2010, the Clerk of Court for the United States District Court for the

21

22     [3]  Title 47 U.S.C. §§ 605, et seq., prohibits the unauthorized use of wire or radio
23  communications, including interception and broadcast of pirated cable or broadcast
    programming.

24     [4]  Title 47 U.S.C. §§ 553, et seq., prohibits the unauthorized interception or receipt, or
25  assistance in the intercepting or receiving, of cable service.

26     [5]  The declaration also avers that personal service had been attempted on two prior
    occasions.  (Dkt. No. 6 at 2.)

3

1   Eastern District of California entered a certificate of default in this action against defendant.

2   (Dkt. No. 9.)  In entering the default, the Clerk of Court stated that it appeared from the record

3   and papers on file in this action that defendant was duly served with process yet failed to appear,

4   plead or answer plaintiff's complaint within the time allowed by law.  (Id.)

5              On April 10, 2010, plaintiff filed the instant application for default judgment.

6   (Dkt. No. 12.)  The application seeks judgment on plaintiff's claims for violation of 47 U.S.C.

7   § 605 and 47 U.S.C. § 553, and for common law conversion.[6]  Plaintiff requests judgment in the

8   amount of $112,000.  Plaintiff further states that it served notice of the instant Application for

9   Default Judgment and supplemental pleadings on defendant by mail.  (Dkt. No. 12 at 4.)  No

10  response to this application is on record in this action.

11  II.  Legal Standards

12             Pursuant to Federal Rule of Civil Procedure 55, default may be entered against a

13  party against whom a judgment for affirmative relief is sought who fails to plead or otherwise

14  defend against the action.  See Fed. R. Civ. P. 55(a).  However, "[a] defendant's default does not

15  automatically entitle the plaintiff to a court-ordered judgment."  PepsiCo, Inc. v. Cal. Sec. Cans,

16  238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) (citing Draper v. Coombs, 792 F.2d 915, 924-25

17  (9th Cir. 1986)); see Fed. R. Civ. P. 55(b) (governing the entry of default judgments).  Instead,

18  the decision to grant or deny an application for default judgment lies within the district court's

19  sound discretion.  Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980).  In making this

20  determination, the court may consider the following factors:

21             (1) the possibility of prejudice to the plaintiff; (2) the merits of
              plaintiff's substantive claim; (3) the sufficiency of the complaint;
22             (4) the sum of money at stake in the action; (5) the possibility of a
              dispute concerning material facts; (6) whether the default was due
23

24  ────────────────

25  [6]  The application does not specifically request judgment on plaintiff's claim that
    defendant violated California Business and Professions Code §§ 17200, et seq., and plaintiff's
    memorandum in support of the application does not address this claim.  Accordingly, the
26  undersigned does not address this claim.

1    to excusable neglect; and (7) the strong policy underlying the
     Federal Rules of Civil Procedure favoring decisions on the merits.
2

3   Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Default judgments are ordinarily

4   disfavored.  Id. at 1472.

5           As a general rule, once default is entered, well-pleaded factual allegations in the

6   operative complaint are taken as true, except for those allegations relating to damages.

7   TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (citing

8   Geddes v. United Fin. Group, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)); see also Fair

9   Housing of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002).  Although well-pleaded

10  allegations in the complaint are admitted by a defendant's failure to respond, "necessary facts not

11  contained in the pleadings, and claims which are legally insufficient, are not established by

12  default."  Cripps v. Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992) (citing Danning

13  v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978)); accord DIRECTV, Inc. v. Huynh, 503 F.3d 847,

14  854 (9th Cir. 2007) ("[A] defendant is not held to admit facts that are not well-pleaded or to

15  admit conclusions of law" (citation and quotation marks omitted).); Abney v. Alameida, 334 F.

16  Supp. 2d 1221, 1235 (S.D. Cal. 2004) ("[A] default judgment may not be entered on a legally

17  insufficient claim.").  A party's default conclusively establishes that party's liability, although it

18  does not establish the amount of damages.  Geddes, 559 F.2d at 560; cf. Adriana Int'l Corp. v.

19  Thoeren, 913 F.2d 1406, 1414 (9th Cir. 1990) (stating in the context of a default entered pursuant

20  to Federal Rule of Civil Procedure 37 that the default conclusively established the liability of the

21  defaulting party).

22  III.   ANALYSIS

23        A.   Appropriateness of the Entry of Default Judgment Under the Eitel Factors

24             1.   Factor One: Possibility of Prejudice to Plaintiff

25          The first Eitel factor considers whether the plaintiff would suffer prejudice if

26  default judgment is not entered, and such potential prejudice to the plaintiff militates in favor of

1  granting a default judgment.  See PepsiCo, Inc., 238 F. Supp. 2d at 1177.  Here, plaintiff would

2  potentially face prejudice if the court did not enter a default judgment.  Absent entry of a default

3  judgment, plaintiff would be without another recourse for recovery.  Accordingly, the first Eitel

4  factor favors the entry of default judgment.

5              2.      Factors Two and Three: The Merits of Plaintiff's Substantive Claims and
                       the Sufficiency of the Complaint

6

7              The undersigned considers the merits of plaintiff's substantive claims and the

8  sufficiency of the complaint together below because of the relatedness of the two inquiries.  The

9  undersigned must consider whether the allegations in the complaint are sufficient to state a claim

10  that supports the relief sought.  See Danning, 572 F.2d at 1388; PepsiCo, Inc., 238 F. Supp. 2d at

11  1175.

12             Plaintiff seeks entry of default judgment on its claims brought pursuant to 47

13  U.S.C. § 605(a) and 47 U.S.C. § 553(a).[7]  Plaintiff's inability to allege the precise nature of the

14  intercepted transmission in this case, which is largely due to defendant's failure to appear or

15  defend itself in the action, raises a question regarding the scope of 47 U.S.C. § 605(a) and the

16  sufficiency of plaintiff's claim under that provision.  The Federal Communications Act prohibits,

17  among other things, commercial establishments from intercepting and broadcasting  radio

18  communications to its patrons.  See 47 U.S.C. § 605(a).  In relevant part, 47 U.S.C. § 605(a)

19  states:

20             No person not being authorized by the sender shall intercept any radio
               communication and divulge or publish the existence, contents, substance,
21             purport, effect, or meaning of such intercepted communication to any
               person.  No person not being entitled thereto shall receive or assist in
22             receiving any interstate or foreign communication by radio and use such
               communication (or any information therein contained) for his own benefit
23

24             [7]  The undersigned does not address the merits of, or sufficiency of the allegations in
    support of, plaintiff's state law claim for conversion.  As discussed more fully below, the
25  undersigned need not reach plaintiff's conversion claim because the recommended statutory
    damages, if awarded, will sufficiently compensate plaintiff such that an award for conversion
26  damages would be duplicative.

1   or for the benefit of another not entitled thereto.  No person having
2   received any intercepted radio communication or having become
    acquainted with the contents, substance, purport, effect, or meaning of
    such communication (or any part thereof) knowing that such
3   communication was intercepted, shall divulge or publish the existence,
    contents, substance, purport, effect, or meaning of such communication (or
4   any part thereof) or use such communication (or any information therein
    contained) for his own benefit or for the benefit of another not entitled
5   thereto.

6   The Ninth Circuit Court of Appeals has determined that satellite television signals are covered

7   communications under 47 U.S.C. § 605(a).  DIRECTV, Inc. v. Webb, 545 F.3d 837, 844 (9th

8   Cir. 2008).

9            The scope of section 605(a) is less clear with respect to transmissions intercepted

10  from a cable system, which are expressly covered under 47 U.S.C. § 553(a).  Section 553(a)

11  states, in relevant part:  "No person shall intercept or receive or assist in intercepting or receiving

12  any communications service offered over a cable system, unless specifically authorized to do so

13  by a cable operator or as may otherwise be specifically authorized by law."  47 U.S.C.

14  § 553(a)(1).[8]

15           Here, plaintiff has not alleged whether the transmission that defendant intercepted

16  was from a cable system or a satellite television signal.  As plaintiff's brief correctly suggests, a

17  split of authority has developed regarding the scope of section 605(a) in that numerous courts

18  have concluded that section 605(a) applies exclusively to broadcasts obtained by way of a

19  satellite television signal, as opposed to transmissions over a cable system, and that section 553

20  applies exclusively to transmission over a cable system.  Compare United States v. Norris, 88

21  F.3d 462, 466-69 (7th Cir. 1996) (holding that sections 553(a) and 605(a) are not "overlapping

22

23           [8] Section 553 carries lower minimum statutory damages and lower enhanced damages
    than section 605.  Compare 47 U.S.C. §§ 605(e)(3)(C)(i)(II) and 605(e)(3)(C)(ii) (providing for
24  the award of statutory damages of not less than $1,000 and no more than $10,000, and under
    certain circumstances enhanced damages of up to $100,000 per violation), with 47 U.S.C.
25  § 553(c)(3)(A)(ii) (providing for the award of statutory damages of not less than $250 and not
    more than $10,000, and under certain circumstances enhanced damages of up to $50,000 per
26  violation).

                                                  7

1   statutes" and are thus mutually exclusive), <u>with</u> Int'l Cablevision, Inc. v. Sykes, 75 F.3d 123,

2   132-33 (2d Cir. 1996) (holding that section 605 and section 553 are not completely overlapping);

3   <u>see also</u> TKR Cable Co. v. Cable City Corp., 267 F.3d 196, 204-07 (3d Cir. 2001) (recognizing

4   the disagreement between the holdings in <u>Norris</u> and <u>Sykes</u>, and holding "that § 605

5   encompasses the interception of satellite transmissions to the extent reception or interception

6   occurs prior to or not in connection with, distribution of the service over a cable system, and no

7   more" (internal quotation marks omitted)).

8           At a minimum, plaintiff's complaint and evidence support a conclusion that

9   defendant intercepted, without authorization, a transmission of the Program and broadcast it to its

10  patrons.  Plaintiff essentially concedes that its complaint and the record contain no allegations or

11  evidence substantiating the nature of the transmission that was intercepted by defendant.

12  Plaintiff argues, however, that although it was unable to allege the precise means of transmission

13  in this case (i.e., transmission over a cable system or satellite broadcast), it "should not be

14  prejudiced" given defendant's failure to appear or defend itself in this action.  (Pl.'s Memo. of P.

15  & A. in Supp. of Application for Default J. at 3, Dkt. No. 12, Doc. No. 12-2.)  The undersigned

16  agrees with plaintiff that under the circumstances of this case, where plaintiff was deprived of the

17  opportunity to conduct discovery regarding the transmission at issue because of defendant's

18  failure to appear or defend itself in this action, plaintiff should not suffer the resulting prejudice.

19  In any event, the split of authority presented above has little practical impact in this case because

20  the undersigned will recommend the entry of a judgment in the total amount of $10,000, which is

21  the maximum, non-enhanced statutory damages available under both 47 U.S.C. §

22  553(c)(3)(A)(ii) and 47 U.S.C. § 605(e)(3)(C)(i)(II).  Thus, insofar as the merits of plaintiff's

23  statutory claims and the sufficiency of its pleadings under the <u>Eitel</u> factors are concerned, the

24  complaint and record before the undersigned favor entry of default judgment.

25          3.      Factor Four: The Sum of Money at Stake in the Action

26          Under the fourth factor cited in <u>Eitel</u>, "the court must consider the amount of

8

money at stake in relation to the seriousness of Defendant's conduct." PepsiCo, Inc., 238 F. Supp. 2d at 1177; see also Philip Morris USA, Inc. v. Castworld Prods., Inc., 219 F.R.D. 494, 500 (C.D. Cal. 2003).  Here, plaintiff seeks a significant amount of damages, i.e., $112,200. However, plaintiff's request for statutory damages and damages for conversion are tailored to defendants' specific wrongful conduct.  Plaintiff seeks statutory damages under the federal statutes implicated by its claims and, although plaintiff requests $110,000 in statutory damages, the statutes involved contemplate such an award under certain circumstances.[9]  Under these circumstances, the undersigned concludes that this factor favors the entry of default judgment.

    4. Factor Five: The Possibility of a Dispute Concerning Material Facts

    The facts of this case are relatively straightforward, and plaintiff has provided the court with well-pleaded allegations supporting its statutory claims and affidavits in support of its allegations.  Here, the court may assume the truth of well-pleaded facts in the complaint (except as to damages) following the clerk's entry of default and, thus, there is no likelihood that any genuine issue of material fact exists.[10]  See, e.g., Elektra Entm't Group Inc. v. Crawford, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists."); accord Philip Morris USA, Inc., 219 F.R.D. at 500; PepsiCo, Inc., 238 F. Supp. 2d at 1177.

    5. Factor Six: Whether the Default Was Due to Excusable Neglect

    Upon review of the record before the court, the undersigned finds that the default was not the result of excusable neglect.  See PepsiCo, Inc., 238 F. Supp. 2d at 1177.  Plaintiff made numerous attempts to personally serve each defendant with the summons and complaint

---

  [9]  Whether plaintiff is entitled to an award of this size is a different issue, which the undersigned addresses in greater detail below.

  [10]  Defendant's failure to file an answer in this case or a response to the instant default application further supports the conclusion that the possibility of a dispute as to material facts is minimal.

1    and ultimately effectuated substituted service of those documents on defendant.  Moreover,

2    plaintiff served defendant by mail with notice of its application for default judgment.  Despite

3    ample notice of this lawsuit and plaintiff's intention to seek a default judgment, defendant has

4    not appeared in this action to date.  Thus, the record suggests that defendant has chosen not to

5    defend this action, and not that the default resulted from any excusable neglect.  Accordingly,

6    this <u>Eitel</u> factor favors the entry of a default judgment.

7                6.      <u>Factor Seven: The Strong Policy Underlying the Federal Rules of Civil Procedure Favoring Decisions on the Merits</u>

8

9           "Cases should be decided upon their merits whenever reasonably possible."  <u>Eitel</u>,

10    782 F.2d at 1472.  However, district courts have concluded with regularity that this policy,

11    standing alone, is not dispositive, especially where a defendant fails to appear or defend itself in

12    an action.  <u>PepsiCo, Inc.</u>, 238 F. Supp. 2d at 1177; <u>see</u> <u>also</u> <u>Craigslist, Inc. v. Naturemarket, Inc.</u>,

13    ___ F. Supp. 2d ___, No. C 08-5065 PJH, 2010 WL 807446, at *16 (N.D. Cal. Mar. 5, 2010);

14    <u>ACS Recovery Servs., Inc. v. Kaplan</u>, No. C 09-01304, 2010 WL 144816, at *7 (N.D. Cal. Jan.

15    11, 2010) (unpublished); <u>Hartung v. J.D. Byrider, Inc.</u>, No. 1:08-cv-00960 AWI GSA, 2009 WL

16    1876690, at *5 (E.D. Cal. June 26, 2009) (unpublished).  Accordingly, although the undersigned

17    is cognizant of the policy in favor of decisions on the merits—and consistent with existing policy

18    would prefer that this case be resolved on the merits—that policy does not, by itself, preclude the

19    entry of default judgment.

20           Upon consideration of the <u>Eitel</u> factors, the undersigned concludes that plaintiff is

21    entitled to the entry of default judgment against defendant and will make a recommendation to

22    that effect.  What remains is the determination of the amount of damages to which plaintiff is

23    entitled.

24        B.      <u>Terms of the Judgment to Be Entered</u>

25           After determining that a party is entitled to entry of default judgment, the court

26    must determine the terms of the judgment to be entered.  Considering plaintiff's briefing and the

1    record in this case, including the affidavits and declarations submitted by plaintiff, the

2    undersigned concludes that plaintiff is entitled to an award of statutory damages in the amount of

3    $10,000 as a result of defendant's unlawful interception and broadcast of the Program, and will

4    recommend the same.

5             Pursuant to section 605, a court may award statutory damages of "not less than

6    $1,000 or more than $10,000" for violation of the Federal Communications Act, and may also

7    award enhanced damages of up to $100,000 if the "violation was committed willfully and for

8    purposes of direct or indirect commercial advantage or private financial gain." 47 U.S.C.

9    § 605(e)(3)(C)(i)(II), (e)(3)(C)(ii).  Where a violation 47 U.S.C. § 553(a) is concerned, a court

10   may award statutory damages of "not less than $250 or more than $10,000," and may increase the

11   award up to $50,000 if the "violation was committed willfully and for purposes of commercial

12   advantage or private financial gain."  47 U.S.C. § 553(c)(3)(A), (B).

13            Here, plaintiff seeks a judgment in the amount of $112,200.  Plaintiff's

14   application for default judgment and proposed order indicate that this sum consists of $110,000

15   for a violation of 47 U.S.C. § 605(e)(3)(B)(iii) and (e)(3)(C)(ii), and $2,200 as compensatory

16   damages arising from defendant's act of conversion.  (See Dkt. No. 12 at 3; Doc. No. 12-3 at 2.)

17            In this case, plaintiff's investigator provided evidence that the establishment had

18   about 35 patrons inside and that defendant's restaurant was unlawfully broadcasting the Program

19   on one 35 inch television mounted in the corner of the defendant's establishment.  (December 11,

20   2008 Affidavit.)  Defendant's establishment is not large, and there is no evidence of a repeat

21   violation or additional egregious circumstances.  The investigator reported that there was no

22   cover charge for entry on the night in question.  There is no evidence before the court of any

23   promotion by defendant that the fight would be shown at the establishment.  There is also no

24   evidence before the court that a special premium on food and drink was being charged at the

25   establishment on the night of the fight or that the establishment was doing any greater level of

26   business on the night the fight was shown that at any other time.  Finally, plaintiff has presented

1   no evidence to the court suggesting that the defendant was a repeat broadcast piracy offender.

2   Balancing these facts with the widespread problem of piracy and the need for an award sufficient

3   to deter future piracy, the undersigned will recommend an award of statutory damages in the

4   amount of $10,000.  On the record before the court, the undersigned does not find that this case

5   merits an award of enhanced damages.

6          Plaintiff also seeks actual damages for defendant's alleged tortious act of

7   conversion in the amount of $2,200, which consists of the fee that defendant would have had to

8   pay to plaintiff in order to lawfully broadcast the Program through a contractual sublicense.[11]

9   (See Pl.'s Proposed Order at 2, Dkt. No. 12, Doc. No. 12-5; Gagliardi Aff. ¶ 8 & Ex. 1.)  The

10  undersigned will not recommend an award of damages with respect to plaintiff's conversion

11  claim.  The statutory damages provisions at issue serve not only a deterrent function, see J & J

12  Sports Prods. v. Orellana, No. 08-05468 CW, 2010 WL 1576447, at *3 (N.D. Cal. Apr. 19, 2010)

13  (unpublished), but also a compensatory function, which is evidenced by provisions that permit

14  the award of statutory damages or actual damages in a civil action.  See 47 U.S.C.

15  § 605(e)(3)(C)(I); 47 U.S.C. § 553(c)(3)(A)(i).  Here, the recommended award of statutory

16  damages in the amount of $10,000 sufficiently compensates plaintiff, and this case does not

17  present a set of circumstances where an additional award might be warranted.  Accordingly, the

18  undersigned will recommend that plaintiff be awarded no damages on its conversion claim.[12]

19

20          [11]  Damages for conversion are measured, in relevant part, by the value of the property at
    the time of the conversion.  Cal. Civ. Code § 3336; see also Stan Lee Trading, Inc. v. Holtz, 649
21  F. Supp. 577, 581 (C.D. Cal. 1986); Spates v. Dameron Hosp. Ass'n, 114 Cal. App. 4th 208, 221,
    7 Cal. Rptr. 3d 597, 608 (Ct. App. 2003).
22
          [12]  Because the undersigned will not recommend an award of damages on plaintiff's
23  conversion claim, the court need not address the thought-provoking question of whether an
    interest in intangible property such as an exclusive license to distribute a broadcast signal is the
24  proper subject of a claim of conversion under California law.  Compare, e.g., Fremont Indem.
    Co. v. Fremont Gen. Corp., 148 Cal. App. 4th 97, 119-20, 55 Cal. Rptr. 3d 621, 638 (Ct. App.
25  2007) (acknowledging California courts' traditional refusal to recognize as conversion the
    unauthorized taking of intangible interests that are not merged with or reflected in something
26  tangible), with DIRECTV, Inc. v. Pahnke, 405 F. Supp. 2d 1182, 1189-90 (E.D. Cal. 2005)

Finally, although the prayer for relief in the complaint and the application for default judgment indicate that plaintiff seeks the award of costs and attorneys' fees, the application for default judgment contains no argument or evidence in support of such a request. Accordingly, the undersigned will not recommend the award of costs or attorneys' fees.

IV.   <u>CONCLUSION</u>

For the reasons stated above, the court HEREBY RECOMMENDS that:

1.   Plaintiff's application for default judgment (Dkt. No. 12) against defendant Juan Jose Hernandez, individually and d/b/a Mazatlan Tacos y Mariscos a/k/a Mariscos Mazatlan be granted;

2.   The court enter judgment against defendant on plaintiff's claims brought pursuant to 47 U.S.C. § 605(a) and 47 U.S.C. § 553(a);

3.   The court award statutory damages in an amount of $10,000.00 to plaintiff; and

4.   This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Turner v.</u>

////

////

(concluding that the exclusive right to distribute proprietary cable programming is the proper subject of a conversion claim under California law), and <u>Don King Prods./Kingvision v. Lovato</u>, 911 F. Supp. 419, 423 (N.D. Cal. 1995) (holding that plaintiff's alleged exclusive rights to distribute a telecast in California constituted a right to possession of property supporting a claim of conversion).

Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

DATED:  May 14, 2010

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE